FILED
CHARLOTTE, N. C.

# United States District Court

JAN 2 9 2007

__WESTERN__ DISTRICT OF __NORTH CAROLINA__

U. S. DISTRICT COURT
W. DIST. OF N. C.

UNITED STATES OF AMERICA

v.

**CRIMINAL COMPLAINT**

**David Allen Hagen, aka David Hagen**

CASE NUMBER: 3:07Mj15

I, the undersigned complainant being duly sworn state the following is true and correct to the best of my knowledge and belief. On or about __03/01/2005 – Present__ in Mecklenburg county, in the __Western__ District of __North Carolina__ defendant(s) did,

**commit violations of Title 18, U.S.C. § 78j(b) Manipulative and Deceptive Devices, Title 17, C.F.R. 240.10b-5 Employment of Manipulative and Deceptive Devices, Title 15, U.S.C. § 78ff(a) Willful Violations; False and Misleading Statements, Title 18, U.S.C. § 1341 Frauds and Swindles, Title 18, U.S.C. § 1343 Fraud by Wire, Title 18, U.S.C.§ 1349 Conspiracy, Title 18, U.S.C. § 371 Conspiracy, Title 18, U.S.C. § 1957 Money Laundering, and Title 18, U.S.C. § 1956 Money Laundering.**

I further state that I am a(n) __Special Agent of the FBI__ and that this complaint is based on the following facts:
Official Title

**See Attached Affidavit hereby incorporated by reference as if fully restated herein.**

Continued on the attached sheet and made a part hereof: ☒ Yes ☐ No

_Signature of Complainant_

**Douglas P. Curran**
**Special Agent**
**Federal Bureau of Investigation**

**AUSA - Matthew T. Martens**
Sworn to before me and subscribed in my presence,

__01/29/2007__                                              at __Charlotte, NC__
Date                                                              City and State

__David Keesler, United States Magistrate Judge__
Name & Title of Judicial Officer                      Signature of Judicial Officer

# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF NORTH CAROLINA

## Affidavit in Support of Warrant for Arrest

Affiant Douglas P. Curran, having been duly sworn, hereby deposes and states:

### Experience of Affiant

1. I have been a Special Agent with the Federal Bureau of Investigation since 1999, and I am currently assigned to the Charlotte Division Financial Crime Squad. In this capacity, I am assigned to investigations involving Securities Fraud, Corporate Fraud, Mail Fraud, Wire Fraud, Money Laundering, and other violations. I have received training at the FBI Academy in Quantico, Virginia, regarding these, as well as many other criminal violations. I have personally been the case agent for various investigations that have resulted in the indictment and conviction of numerous subjects. I have also participated in ordinary methods of investigation, including but not limited to, consensual monitoring, physical surveillance, interviews of witnesses and subjects, the use of confidential informants, pen registers, and Title III court ordered interceptions. I have previously been the Affiant for search and seizure warrants.

2. The information contained in this Affidavit is based upon personal knowledge, information provided by to me by other Special Agents of the FBI, and other noted sources. Because this Affidavit is submitted for the limited purpose of establishing probable cause in support of the application for an arrest warrant, it does not set forth each and every fact that I or others have learned during the course of the investigation.

### PURPOSE OF THIS AFFIDAVIT

3. This Affidavit is presented in support of an application for an arrest warrant for DAVID ALLEN HAGEN, born 01/03/1955.

4. Your Affiant respectfully submits that the facts and circumstances detailed in this Affidavit indicate violations of:

   - 15 U.S.C. § 78j(b). Manipulative and deceptive devices
   - 17 C.F.R. 240.10b-5. Employment of manipulative and deceptive devices\
   - 15 U.S.C. § 78ff(a). Willful violations; false and misleading statements
   - 18 U.S.C. § 1341. Frauds and swindles
   - 18 U.S.C. § 1343. Fraud by wire
   - 18 U.S.C. § 1349. Conspiracy

**g.** 18 U.S.C. § 371. Conspiracy
**h.** 18 U.S.C. § 1957. Money Laundering
**i.** 18 U.S.C. § 1956. Money Laundering

## BACKGROUND AND INVESTIGATIVE SUMMARY

5.  On or about June 2, 2004 the FBI's Charlotte Division opened an investigation pertaining to a commodities fraud scam being operated by Coyt Murray, Sr., d/b/a Tech Traders, Inc. (Tech Traders) and assigned the investigation to your Affiant. This investigation was initiated as a result of a civil suit filed by the Commodity Futures Trading Commission (CFTC), entitled <u>CFTC v. Equity Financial Group, LLC. et al.</u> (D.N.J.). The investigation subsequently expanded to include allegations of securities fraud by individuals identified in the commodities fraud investigation, including Howell Woltz, Samuel T. Currin and others.

6.  The subsequent securities fraud investigation conducted by your Affiant related to a complaint filed on or about February 14, 2005 by the United States Securities and Exchange Commission (SEC) in United States District Court in the Southern District of Florida against, among others, Absolute Health and Fitness, Inc. (AHFI) and Concorde America, Inc. (CNDD).

7.  In this complaint, the SEC alleged that investors in AHFI and CNDD had been defrauded in "...two classic pump and dump schemes". Among other things, the complaint alleged that from June through August of 2004, the defendants participated in the fraudulent promotion and dumping of CNDD stock. The complaint also alleged that, from June through December of 2004, the defendants engaged in the market manipulation of AHFI's stock.

8.  On April 25, 2005, the SEC filed a complaint in United States District Court in the Southern District of Florida against Bio-Heal Laboratories, Inc. (BHLL). BHLL purported to be a company involved in developing topical natural healing products in Nicaragua.

9.  In this complaint, the SEC claimed that the defendants reaped $10 million dollars in illegal profits by selling BHLL stock, while fraudulently touting the stock to investors over the internet. The complaint further alleged that the profits were laundered thorough offshore accounts under the names of various relief defendants.

10. Your Affiant has been investigating HAGEN and others (including participants in the AHFI, CNDD and BHLL schemes) for their participation in a similar securities fraud scheme beginning in early 2005 and continuing through the present involving the publicly traded shares of GTX Global Corp. (GTX).

11. Your Affiant has obtained the cooperation of a Cooperating Witness (CW) who

was an integral part of the AHFI, CNDD, BHLL and GTX securities fraud schemes. CW conspired in the aforementioned securities fraud schemes by, among other things, conducting the fraudulent promotional campaigns for each of the securities.

12. My investigation has revealed that, as early as 2003, CW further conspired with others to launder the proceeds of the securities fraud schemes. Certain financial transactions in furtherance of this money laundering conspiracy transpired in a bank account titled by Bank of America as being located in Denver, North Carolina within the Western District of North Carolina. My investigation has further revealed that, in or about 2005, HAGEN joined the money laundering conspiracy in order to launder the proceeds of the GTX securities fraud scheme.

13. CW has assisted in the GTX investigation by making consensual telephone recordings with HAGEN and other perpetrators of the GTX scheme, providing records and documents, and relating the details of prior meetings, plans, and conversations with his co-conspirators.

14. In or about 2005, HAGEN, CW and others created and controlled off-shore shell companies, including but not limited to Laureate's Way, Inc. (Laureate's Way), Walcott Indies, Ltd. (Walcott), Toubetskoy & Co. Ltd. (Toubetskoy), Touissant Liberte, SA (Touissant), Valcien, SA (Valcien) and Intelligy Corp. (Intelligy). HAGEN, CW and others then issued or transferred millions of shares of GTX stock to these companies. These shares were subsequently deposited with several Canadian brokerage firms, including Global Securities Corp. (Global Securities), Union Securities Ltd. (Union Securities), and Blackmont Capital, Inc. (Blackmont Capital).

15. In or about 2005, HAGEN, CW and others caused to be created and/or controlled web sites such as www.ironinvesting.com, www.urgentstockpicks.com, www.risingpennystocks.com, www.amazingpennystocks.com, www.insidepennystocks.com and www.rapidpennystocks.com, which posted false, fraudulent and misleading promotional materials regarding GTX. For example, the web sites contained outlandish and unrealistic projections regarding the future stock price of GTX, and misrepresented, in the disclaimer section, the ownership of GTX shares by the parties preparing the projections. These promotional materials all omitted the fact that the co-conspirators had obtained control of large quantities of the securities being promoted in anticipation of their intended plan to conduct a promotional campaign regarding those securities and profit on the sale of those securities once the promotional campaign caused the prices of the securities to rise.

16. In or about 2005, HAGEN, Brecher and others also caused corporate press releases to be issued that made fraudulent representations regarding GTX. For example, GTX issued a press release falsely representing that a merger with another technology company had occurred.

17. In addition to the aforementioned web sites and press releases, other methods utilized by HAGEN, CW and others to fraudulently promote the GTX stock included internet search engine advertising, spam e-mail, and unsolicited mass faxes. Each of these promotional techniques involved the used of interstate wire transmissions.

18. When the price of GTX's stock rose in response to the fraudulent promotional activity, HAGEN, CW and others caused the GTX shares held in the Canadian brokerage accounts to be sold for tens of millions of dollars. HAGEN, CW and others then laundered the proceeds by first transferring the funds to an account at First Caribbean International Bank (First Caribbean) in the Bahamas under the name of Montaque Securities International, Ltd. (Montaque), a financial services advisory firm in Nassau, Bahamas. These funds were then wired from the Montaque account at First Caribbean to, among other destinations, one or more accounts controlled by HAGEN at First Curacao International Bank N.V. (First Curacao) in the Netherlands Antilles, accounts controlled by CW in Cyprus, and ultimately to accounts controlled by CW and others in the United States.

19. HAGEN currently resides in Nassau, Bahamas. HAGEN has discussed on numerous recorded telephone calls with CW his successful efforts to obtain false identification documents. HAGEN has stated that he has purchased three separate sets of identification documents complete with false birth certificates, driver licenses and passports. HAGEN informed CW that he changed his appearance on at least one of the sets of identification documents. HAGEN has informed CW that these documents are "contingency plans" in case he needs to disappear. HAGEN has been attempting to convince CW to obtain similar types of documents in case CW becomes a target in the GTX investigation.

20. HAGEN has discussed with CW trips HAGEN has made to countries in Africa, including Swaziland and Mozambique. HAGEN informed CW that he met with government officials in these countries and is currently in the process of "buying" himself an appointment as an official diplomat of either Mozambique or Swaziland to the Bahamas. HAGEN has stated to CW that his intention is to have himself appointed as an official diplomat and have his home and all of his property in the Bahamas designated as the property of Swaziland or Mozambique. HAGEN informed CW that this will make him untouchable to the United States authorities if they attempt to apprehend him. HAGEN advised CW that he will be free to visit the United States, move freely through all international airports, and not be worried about being arrested by any United States law enforcement authorities.

## PROBABLE CAUSE

21. AutoleaseCheck.com, Inc. (Autolease) was a publicly traded shell company

incorporated under the laws of the State of Florida in or about 1997. On or about March 8, 2005, the name of Autolease was changed to Gatelinx Global Corp. (Gatelinx). On or about September 30, 2005, the name of the company was again changed to GTX Global Corp. (GTX). The company's stock was quoted on the Pink Sheets and traded under the symbol "GTXC".

22. GTX purported to maintain offices in Southern Pines, North Carolina, with a website address www.gtxglobal.net. This website was maintained by Data Consulting Group of Matthews, North Carolina. The computer server which housed the GTX web site was located at a facility operated by a company called Charlotte Co-Locators. The Charlotte Co-Locators building is located in the Southpark area of Charlotte, North Carolina, within the Western District of North Carolina.

23. HAGEN was the President and Chief Executive Officer of GTX from in or about February of 1999 through in or about October of 2005. After 2005, HAGEN served as a "consultant" to GTX.

24. Subject Mark E. Brecher was and still is the Secretary/Treasurer of GTX.

25. Subject Warren K. Hansen was a stock broker who was enlisted by CW to manipulate the price of GTX stock in the open market during the promotional campaign conducted by CW. Hansen was employed with various brokerage firms in Florida.

26. CW was not employed by GTX, but worked with HAGEN and Brecher, among others, to perpetrate the GTX securities scheme.

27. Vernice Woltz (V. Woltz), a Bahamian citizen and former employee of a Bahamian based company named Sterling ACS Ltd. (Sterling ACS), is currently in custody and under federal indictment in the United States. As an employee with Sterling ACS, V. Woltz was in the business of forming and managing offshore entities for, among others, United States residents. On or about May 17th, 24th and June 1st, 2006, V. Woltz was interviewed pursuant to a proffer agreement. V. Woltz stated as follows:

   a. In or about March 2005, CW requested that V. Woltz form several Anguillan companies including, among others, Laureate's Way, Toubetskoy, and Walcott.

   b. V. Woltz's understanding from CW was that these companies were being created to hold the funds resulting from the sales of GTX stock, and to conceal the identities of the true owners of the GTX shares.

   c. V. Woltz learned that, in or about September of 2005, companies with the same names as the Anguillan companies (Walcott, Laureate's Way, and

Toubetskoy) were also incorporated by Montaque under the laws of the Bahamas.

28. In or about June 2006, a search was conducted of the Sterling ACS offices in Nassau, Bahamas. As a result of that search, documents were recovered indicating that Intelligy was controlled by HAGEN.

29. CW advised your Affiant, thus corroborating the information received from V. Woltz, that Laureate's Way, Toubetskoy, Walcott, Toussaint, and Valcien were all created and controlled by CW, HAGEN, Brecher and others with the knowledge and intent to hold shares of GTX, to launder the proceeds resulting from the sale of shares following the fraudulent promotional activities, and to hide the identities of HAGEN, Brecher, CW and others as being the actual owners of GTX shares.

30. CW advised your Affiant that Brecher maintained a business contact at Montaque named Edison Sumner. CW, HAGEN and Brecher all agreed to request that Sumner cause Montaque to incorporate Walcott, Laureate's Way, Toubetskoy, Toussaint and Valcien in the Bahamas. Sumner was also asked to set up brokerage accounts at Montaque under the same names.

31. According to V. Woltz and CW, in or about mid-2005, HAGEN requested that certain shares of GTX stock be transferred to the names of the Anguillan companies that CW had V. Woltz form earlier that year.

32. CW advised your Affiant that CW was present at several meetings and participated in phone calls, during which plans for the GTX securities fraud scheme were discussed. HAGEN was among those present at a majority of these meetings, and also took part in telephone calls with CW. CW further advised that:

   a. Through discussions at these meetings and subsequent telephone conversations with CW, HAGEN was made aware that the GTX scheme would involve the use of web sites to promote the stock. HAGEN was also made aware that CW would use a "network" of brokers to manipulate the price of the GTX stock.

   b. CW, HAGEN, Brecher and others were all made aware through these discussions that after the GTX shares rose in value as a result of the promotional activities carried out by CW, the GTX shares being held in the Canadian brokerage accounts would be sold, and the resulting profits distributed amongst the group. CW has provided your Affiant with a handwritten contract between CW, Brecher and HAGEN, drawn up prior to the time the GTX stock promotions began, which details how the profits from the GTX scheme were to be distributed amongst the co-conspirators. The names of the aforementioned offshore entities are used in the

document instead of the defendant's actual names. A copy of the contract is attached hereto as attachment A.

    c.  During a meeting held at CW's residence to discuss the GTX scheme, CW noticed a shortcut icon on HAGEN's laptop computer which was a direct link to one of the web sites being used by CW to promote the GTX stock.

    d.  CW and HAGEN discussed at the meetings and in subsequent telephone calls, how the aforementioned Anguillan and Bahamian entities and offshore accounts would be used to launder the proceeds resulting from the sale of the GTX shares following the fraudulent promotional activities. HAGEN and CW also discussed the fact that the offshore entities were needed in order to conceal the identities of HAGEN, Brecher, CW and others as being owners of GTX shares.

33. CW advised your Affiant that HAGEN and CW had discussions during which it was stressed that the regulatory authorities could not be allowed to find out that any members of their group owned GTX shares or were behind the promotion of the stock. CW, HAGEN and others discussed at these meetings the fact that the SEC had previously instigated actions against AHFI and BHLL and that they needed to make sure that the same thing did not happen to GTX. Although not involved with the AHFI or BHLL pump and dump schemes, HAGEN was aware that CW had assisted in carrying out those schemes in the same manner as what was being planned for GTX.

34. CW advised your Affiant that, in or about mid to late 2005, CW, HAGEN and Brecher discussed the need to distance HAGEN's name from GTX in general because of HAGEN's prior criminal history. Specifically, CW had previously heard that HAGEN was indicted in or about 1990 in federal court on fraud charges stemming from a direct mail business owned by HAGEN at the time.

35. CW advised your Affiant that, on several occasions, CW discussed with HAGEN that CW would be using his brokerage contacts to assist in setting the price of GTX shares at virtually whatever price they desired after it began trading. CW informed HAGEN that these brokers could also control the volume of trading from day to day in order the assist HAGEN, CW and Brecher in selling their shares into the market after the price of the stock rose to a sufficient levels. CW and HAGEN discussed at various times how it was important not to raise the value of the GTX stock too quickly, or they would draw the attention of the SEC.

36. CW advised your Affiant that he utilized Hansen to conduct the GTX stock trading activities which assisted in raising, lowering, or stabilizing the price of the shares in the open market.

37. CW advised your Affiant that HAGEN and others agreed to begin the promotion

of GTX stock some time in or about late 2005.

38. CW advised your Affiant that HAGEN provided CW with a GTX business plan some time in or about mid 2005 which included earnings projections, forecasts, and business related information. Through discussions which occurred at various meetings with CW, HAGEN and Brecher were both made aware that the information contained in the business plan did not need to be based on fact or any type of actual research and/or analysis. HAGEN and BRECHER were told by CW that the information and projections in the business plan simply needed to support the increase in GTX stock value that would result from CW's promotional activities.

39. CW advised your Affiant that he made HAGEN aware that the business plan and earnings projections would be put on the promotional websites for GTX and used in other promotional activities by brokers.

40. CW advised your Affiant that, throughout the time the promotional activities for GTX were occurring, HAGEN and CW discussed the importance of keeping their identities hidden as being the ones behind the promotion of GTX.

41. Andrew Witty was interviewed by your Affiant in or about March of 2006, during which he stated the following:

    a. Witty is the owner of I-Max Direct.

    b. I-Max Direct is a company which is typically hired by third parties to manage internet based promotional campaigns for companies. I-Max assists companies by directing end users (people conducting research on the internet) to the web sites of their clients, and also in maintaining the content of those web sites.

    c. Witty was hired by CW to work on several internet campaigns from in or about December of 2005 through in or about February of 2006.

    d. Witty assisted in the internet promotional campaign for GTX. During Witty's work on the GTX promotional campaign he assisted in directing end users to, and managing the GTX content placed on, various web sites, including www.ironinvesting.com, www.urgentstockpicks.com, www.risingpennystocks.com, www.amazingpennystocks.com, and www.leadingstockpicks.com.

42. CW confirmed to your Affiant that, in or about December of 2005, CW enlisted Witty to assist in building and maintaining the web sites used to tout GTX stock, and to assist in directing end users to the aforementioned web sites.

43. CW advised your Affiant the he provided Witty with the promotional material touting GTX, which CW had previously received from HAGEN.

44. CW advised your Affiant that Witty was instructed to place the GTX promotional material on the web sites. Specifically, the web sites contained projections regarding the anticipated stock price and business prospects of GTX. For example, the promotional web sites opined that the GTX Global stock price would rise from $6/share to $26/share in 1-3 months and to $45/share in 9-12 months. The web sites further stated that the company had "projected earnings growth of over 250% per year for 3 years" and that "by the end of 2008 sales are expected to hit nearly $717 million." These projections can be seen in printouts of the web sites, enclosed in attachment B.

    **a.** CW advised your Affiant that CW fabricated the forecasts for the increase in GTX stock price without conducting any type of analysis whatsoever. HAGEN understood that CW had done this to assist in pumping up the value of GTX stock.

    **b.** CW advised your Affiant that HAGEN contacted CW after reviewing on the internet the forecasted increase in value for GTX stock which CW had fabricated. According to CW, HAGEN sarcastically commented to CW that the stock forecasts were "very optimistic".

45. The aforementioned web sites also misrepresented who had created and paid for the sites, so as to conceal from potential investors the fact that the individuals promoting the stock were owners of shares who intended to sell these shares after pumping up demand for them. Specifically, the websites contained the disclaimers shown in attachment B. The wording of these disclaimers fails to disclose fully the fact that the individuals responsible for the web sites and their content owned GTX stock.

46. In addition, GTX itself issued a press release, dated December 20, 2005, which was posted on the Pink Sheets web site[1], representing that a merger with another technology company had occurred. A copy of the press release can be seen in attachment C. CW advised that HAGEN, among others, was responsible for the production and release of this information. Brecher testified in the grand jury that he had likely reviewed the press release concerning the merger prior to its issuance. GTX later produced documents to the federal grand jury which show that the merger with the technology company had not occurred by the date of the press release announcing such. A copy of the signature page of the merger agreement dated January 18, 2006, and related documents, are attached hereto as attachment D. GTX later issued a press release on the Pink Sheets web site dated

---

[1] Pink Sheets is a privately held company in New York City which provides an internet-based, real time quotation service for over-the-counter (OTC) equities and bonds for market makers and brokers.

February 2, 2006, advising that the merger between GTX and the technology company had been terminated. A copy of the press release can be seen in attachment E.

47. As a result of these illegal promotional activities, the share price and, more importantly, the trading volume of GTX shares, increased substantially. According to the SEC, the average volume of shares of GTX traded in March 2006 was approximately 194,629 shares per day. On or about April 3, 2006, GTX shares were trading between $2.95 and $3.80, and the trading volume that day was approximately 337,086 shares.

48. According to the SEC, from April 4, 2006 through April 13, 2006 the price of GTX stock rose from $2.46 per share to $5.15 per share. The average volume of shares of GTX traded in April 2006 was approximately 696,304 shares per day.

49. A review of the stock transfer agent records for GTX reveals that, in March 2005, approximately 1 million shares of GTX stock were issued to Intelligy. In April 2005, the 1 million shares of GTX stock previously issued to Intelligy were cancelled, and, stock transfer agent records show that a total of approximately 7 million shares (including the 1 million previously issued to Intelligy) of GTX stock were issued to Laureate's Way, Toussaint, Valcien, Toubetskoy and Walcott Indies.

50. A review of the stock transfer agent records for GTX reveals that in October and November 2005, approximately 3.1 million shares of GTX stock previously issued to Laureate's Way, Toussaint, Valcien, Toubetskoy and Walcott Indies were transferred to three Canadian brokerage firms - Global Securities, Union Securities, and Blackmont Capital.

    a. Transfer agent records reveal that, on or about November 30, 2005, GTX stock certificates numbered 2042 and 2047, which were issued to Laureate's Way, were both cancelled and a new stock certificate numbered 2179 was issued in the name of Global Securities.

    b. Transfer agent records also reveal that on or about October 25th, 2005, GTX Global stock certificates numbered 2037, 2038, 2039, 2081, 2083, and 2084, which were issued to Laureate's Way and Walcott, were cancelled and a new stock certificate numbered 2104 was issued in the name of Global Securities.

    c. Transfer agent records reveal that, on or about November 11, 2005, GTX stock certificates numbered 2061, 2062 and 2063, which were issues to Valcien, were cancelled and a new stock certificate numbered 2170 was issued in the name of Union Securities

    d. Transfer agent records show that, on or about April 24, 2006, GTX stock

certificates numbered 2050-57, 2064-68, 2071-80, 2275, 2278 and 2322, which were issued to Toussaint, Valcien, and Toubetskoy, were cancelled and new stock certificates numbered 2343-50 were issued in the name of Montaque.

e.  Transfer agent records show that on or about May 12, 2006, GTX stock certificates numbered 2343-47, which were issued to Montaque, were cancelled and a new stock certificate numbered 2382 was issued in the name of Blackmont Capital.

f.  The transfer agent records show that GTX shares issued to Laureate's Way and Walcott were deposited into accounts at Global Securities (account numbers 088-8200-3, 47-722U-4, and 44-489U-O).

g.  Transfer agent records show that shares of GTX shares issued to Toussaint and Valcien were deposited in an account at Union Securities (account number 099-0004-4).

51. CW advised your Affiant that HAGEN and CW had numerous discussions pertaining to the aforementioned transfers of GTX stock.

52. CW supplied your Affiant with two Global Securities account statements which show that both Laureate's Way (account number 044-489U-0) and Walcott (account number 047722U-4) have accounts at Global Securities, and each of these accounts holds shares of GTX stock.

53. The SEC has advised that, based on their review of available records, between October 3, 2005 and May 17, 2006, Global Securities cleared sales for approximately 5.6 million shares of GTX stock for total proceeds of approximately $32 million.

54. CW advised your Affiant that HAGEN knew, and discussed with CW, the importance of GTX remaining in operation for a period of time after all of the stock belonging to HAGEN and others was sold into the market demand they created. HAGEN discussed with CW that when the company eventually went out of business it would be blamed on a failed business plan.

55. In or about May 2006, your Affiant learned that CW (before CW began cooperating with the government) controlled an account at Bank of America under the name of Streamline Capital. Bank of America informed your Affiant that CW's account had previously received numerous wire transfers from Intelligy. Your Affiant has since reviewed bank records for these wire transfers.

56. In or about August 2006, CW provided your Affiant with information regarding the transfer of funds resulting from the scheme. CW advised that the proceeds from the sale of stock at the aforementioned Canadian brokerage firms were sent

to Montaque's account at First Caribbean. Montaque then caused these funds to be further wired to the Bank of Cyprus. The funds were then wired from the Bank of Cyprus to the Intelligy account at First Curacao, which according to CW, is controlled by HAGEN. Funds were then further transferred from the Intelligy account at First Curacao to Streamline Capital's account at Bank of America.

    a. CW is aware that the Intelligy account at First Curacao was controlled by HAGEN because on numerous occasions CW requested that HAGEN wire funds to CW. HAGEN agreed to wire the funds to CW, and shortly thereafter, a wire was always received into CW's account from Intelligy in the same dollar amount HAGEN had said would be sent.

57. CW has estimated for your Affiant that HAGEN received somewhere around $5 - $6 million as a result of sales of fraudulently promoted GTX shares. HAGEN informed CW that a majority of HAGEN's share of the proceeds were eventually placed at Butterfield Bank in the Bahamas.

58. CW advised your Affiant that he and HAGEN had several discussions regarding the requests for information pertaining to GTX from both the SEC and federal law enforcement authorities. HAGEN advised CW that the information should be supplied to the government in very small increments and spread over a long period of time. HAGEN stated that GTX should also supply large amounts of irrelevant documentation so as to delay the government investigation until CW, HAGEN, Brecher and others could finish dumping all of their GTX shares.

59. CW conducted a consensual telephonic recording with HAGEN on or about 06/28/2006. During that call the following conversation occurred:

    a. CW:...everything is set up at Montaque...I will call Brecher. We're waiting on 1-2 million shares to be clear at GTX, and Brecher said he has releases he needs put out.

    HAGEN: When is everything going to be in play?

    CW: In the next couple of weeks, according to how slow Brecher moves...

    b. CW advised your Affiant that when HAGEN asked "when is everything going to be in play?", CW felt that HAGEN was asking how long it would be until CW would begin the promotional campaign again for GTX.

60. CW conducted a consensual telephonic recording with HAGEN on or about 06/30/2006. During that call the following conversation occurred:

**a.** CW:…He (Brecher) wanted me to ask you to sign something for Toussaint for $100,000. This money needs to be sent up to GTX…He (Brecher) said to fax it to Montaque. He (Brecher) said it needed to come from Toussaint.
HAGEN: Got it.

CW: I guess this is the joint one that you guys are on or something…

**b.** CW advised your Affiant that this conversation referred to the account at First Caribbean under the name of Toussaint, which had been used to hold and launder proceeds from sales of GTX shares. CW advised that Brecher was asking HAGEN to wire $100,000 in proceeds from prior sales of GTX stock back to Brecher in the United States, to use for current company expenses.

61. CW conducted a consensual telephonic recording with HAGEN on or about 07/27/2006. During that call the following conversation occurred:

**a.** CW: One thing I need to go over with him (Brecher) is some of those shares; he needs to get those free trading ones reissued at some point. Because there's no reason we can't sell those. You just cancelled 8 million Yadio ya know?

HAGEN: Umm, Correct. He just took some of my shares and gave them to Yadio.

CW: Well we need to address that. Before I start any promotion I'm going to tell him that needs to happen.

HAGEN: Right. And we still have the Lynska matter to address.

CW: …I may ask you to reach out for Montaque and get a copy of that signed agreement. Do you have a real safe place you can keep it that's like out of your house?

**b.** CW advised you Affiant that the first half of this conversation referred to the technology company, Yadio, which was a corporation with which GTX had attempted to merge. CW advised that this merger was never completed.

**c.** CW advised your Affiant that the second half of this conversation referred to the fact that, when CW was actually carrying on promotions of GTX, Brecher was selling shares into the market without the consent of the entire group. Brecher was selling the shares out of an account held under the name of Lynska. Brecher had originally told CW that Brecher had set

up this account on his own before the promotions has begun, and issued approximately 500,000 shares to Lynska. After the promotions for GTX had begun, both HAGEN and CW reviewed transfer agent records and saw that Lynska was selling GTX shares into the open market. These sales were depressing the value of GTX stock before the group could unload their own shares into the market at an inflated price. When confronted by CW what was happening with Lynska, Brecher tried to deny knowledge of any stock sales.

62. CW conducted a consensual telephonic recording with HAGEN on or about 07/31/2006. During that call the following conversation occurred:

    **a.**  HAGEN: What's going on with you?

        CW: Nothing much, just dealing with Brecher.

        HAGEN: …does he realize that he needs to update the website or at least make (inaudible) on the website?

        CW: No, I'll go over all that with him. He put a monkey wrench in the promotional plans, so I've put together a list of things he needs to do so that everything is consistent.

        HAGEN: How long will that take?

        CW: I'm going to push for it to be done this week.

    **b.**  CW advised your Affiant that, in this conversation, HAGEN is telling CW that Brecher needs to update the website so as to display information which might warrant the increase in value in GTX stock, even though HAGEN and CW both knew the move was actually due to the promotional activities carried out by CW. CW then informs HAGEN that he has given Brecher a list of things which need to be done by GTX itself, so that the increase in value of the stock appears to be due to something the company did.

63. CW conducted a consensual telephonic recording with HAGEN on or about 08/05/2006. During that call the following conversation occurred:

    **a.**  CW: I think there is still a lot of money to be made on this deal, do you agree?

        HAGEN: Yes.

        CW: I don't understand. Earlier he (Brecher) was hot to trot and the next

day he's…

CW: I'm concerned that if we start promoting right away, the SEC will halt the trade. They won't if we have a larger group of people. If we can pull this off in a week than that would be great.

b. CW advised your Affiant that, in this conversation, he was informing HAGEN that he could begin promotions of GTX again and that the group could then sell their remaining stock at a substantial profit. CW was also informing HAGEN that Brecher wanted CW to begin GTX promotional activity again, but that suddenly Brecher had become very concerned about the content of the promotional campaigns. CW was telling HAGEN that in the previous promotional activities Brecher didn't care at all about the content of the material put out on the web sites to promote GTX, and now all of a sudden Brecher was acting concerned.

c. CW advised your Affiant that, in this conversation, he was expressing concern to HAGEN that they SEC was very likely to halt trading on GTX stock if it rose too quickly following the new promotional activities which CW and HAGEN were planning. Both CW and HAGEN knew that it would take the SEC approximately three weeks to halt trading on GTX stock. Therefore, CW was proposing to HAGEN that they conduct a larger GTX promotional campaign from the beginning, and sell all of their stock before the SEC could halt trading.

64. CW conducted a consensual telephonic recording with HAGEN on or about 08/07/2006. During that call the following conversation occurred:

a. CW: He (Brecher) is bugging me about starting up the market, and I'm not going to do it until he's out of the way.

HAGEN: Now what's he doing about everything down at Montaque?

CW: He's going to go down Tuesday or Wednesday. He needs a couple of company names, the president's names, your kids, or whoever you want to stick on those things.

HAGEN: Okay.

b. CW advised your Affiant that, in this conversation, he was informing HAGEN that CW would not start up promotional activities on GTX stock again until Brecher was "out of the way". Originally the trading entities at Montaque (Laureate's Way, Toussaint, Walcott, Toubetskoy, and Valcien) were set up by Brecher and were under his control. HAGEN and CW had always suspected that Brecher had been transferring GTX shares out of

these entities and selling them on the open market before the group could sell their jointly held shares. CW and Hagen were therefore requiring that the trading entities at Montaque be separated amongst CW, Brecher and HAGEN, so that each individual had complete control over the entity assigned to him.

c. CW advised your Affiant that trusts had been set up as the beneficiaries of the trading entities at Montaque in order to more thoroughly hide the identities of HAGEN, CW and Brecher as the actual owners of GTX stock. HAGEN had originally listed his children as the ultimate beneficiaries of these trusts, to even further hide his identity as being an owner of GTX stock. In this conversation, CW is informing HAGEN that HAGEN needs to supply CW with whatever names HAGEN wants to use as the ultimate beneficiaries of the trading entities at Montaque.

65. CW conducted a consensual telephonic recording with HAGEN on or about 08/13/2006. During that call the following conversation occurred:

a. CW:    Well, I'm trying to get Brecher ready and agree to let my group and everybody start promoting GTX again, because it's been so long, and we need to get it up to $4-$5 before September or so...

HAGEN: Right.

CW: I think I've about gotten there, so anyway. And if we bring Chuck aboard, great, that's more news. As long as something gives us news then...

HAGEN: That's right, that's all you are looking for is something that justifies that.

CW: Ya, that's all we need is news, right?

b. CW advised your Affiant that, in this conversation, CW is relating to HAGEN that he plans on starting up promotional activities on GTX again in the manner as was done previously. CW is telling HAGEN that CW's goal is to pump up the value of GTX stock to about $5 before beginning to dump the group's shares on the market. Hagen comments to CW that "...all you are looking for is something that justifies that." CW understood this to mean that, while HAGEN knew that CW's promotional activity would actually be driving the price increase of the GTX stock, they needed to have news released which could account for the increase in stock price. CW advised your Affiant that the technique of timing promotional activities with GTX news was routinely used by CW, HAGEN and Brecher.

66. CW conducted a consensual telephonic recording with HAGEN on or about 08/17/2006. During that call the following conversation occurred:

    a.  HAGEN: Jumping to the other subject real quick, do you foresee a near future still on GTX?

        CW: Ya, any day. I'm talking to some people tonight about that to see when they are ready to go. Most definitely a near future.

    b.  CW advised your Affiant that, in this conversation, HAGEN is asking CW if he thinks he will be able to begin the promotional activities again soon with GTX. CW then tells HAGEN that he will contact his "people" that evening to see when they would be ready to go. HAGEN is aware from prior conversations that "people" refers to the individuals who have in the past assisted CW with the GTX promotional activities on the internet.

67. CW conducted a consensual telephonic recording with HAGEN on or about 08/23/2006. During that call the following conversation occurred:

    a.  CW: What went on in the market for GTX?

        HAGEN: About 35,000, it went up about 30 or 40 cents.

        CW: Are you serious? That's the total volume? Did you check it after 4?

        HAGEN: Yes.

        CW: Oh my god, this thing is going to fly. That's all it took? I mean, and really it was probably only ten or, I'll have to ask my guys if they did it, and if they did, how much they bought...I'll call and see if they did anything.

        HAGEN: There were two press releases here right?

        CW: Ya, right, Monday and Tuesday.

        HAGEN: Correct.

        CW: Were they any good?

        HAGEN: They were decent...it was all right. It warranted the move.

        CW: That's for sure. I can't believe it took that little of buying to move it up 40 cents.

**b.** CW advised your Affiant that, in this conversation, he is telling HAGEN that he will have to check with his "people" (either the brokers helping to manipulate the GTX stock price, or the individuals assisting CW with the promotional activity) to see if what they had done caused the move up in the GTX stock price. HAGEN responded by informing CW that it appeared the press releases put out by GTX were good enough to make it appear that the news warranted the move up in the GTX stock price. CW advised that HAGEN was aware from prior pump and dump schemes, that CW always coordinated promotional activity, and manipulative trading by brokers, with press releases which would appear to warrant the move up in value of the stock.

68. CW conducted a consensual telephonic recording with HAGEN on or about 08/25/2006. During that call the following conversation occurred:

**a.** CW: What else is going on?

HAGEN: Not much activity with GT.

CW: I'm still waiting on a few things from Brecher that my guys requested from him. I've been on him about that. He said he'll get that over to me tonight. I just need some info on Ivan.

HAGEN: So what do you think? This week still?

CW: I think so. It's all up to Brecher.

HAGEN: Once it's on, do you think it'll stay on?

CW: My plan is to turn it on and then disappear. And then move on to a new one.

**b.** CW advised your Affiant that, in this conversation, HAGEN tells CW that the GTX stock has not increased in value at all. CW responds that his contacts have not started up the promotional activities on GTX because they are waiting on company information which CW needs to obtain from Brecher. When HAGEN asks CW, "Once it's on, do you think it will stay on?", he is asking CW if the promotional activities will continue until the stock price increases enough, and for a long enough period of time, for the group to sell the remainder the their GTX stock.

69. CW conducted a consensual telephonic recording with HAGEN on or about 08/31/2006. During that call the following conversation occurred:

a. CW: Ya know, we need at least a million shares or else this thing will shoot up to $5 and the regulators will halt trading and we just don't want that, or need that. Ya know what I mean?

HAGEN: Right.

CW: But ya know any time I'll be able to start the promotion and everything like that and I've got like a bunch of different analysts who wrote up things, recommending things, and a bunch of different sites. I've got about 10 different websites set up and everything like that, and it's taking a little bit of time to get it all straightened out and different looking and get it where it doesn't tie back to the company or any of us, ya know?

HAGEN: Right.

CW: And also I've got to talk to Brecher about how Ed used to send out those cease and desist letters - get Brecher on board with doing that again, like what we had Ed do in the past whenever anything would generate heat, he'd send out a cease and desist letter.

HAGEN: Right. Well he'll do that anyway.

CW: I'm also waiting on a little bit more information from Brecher so I can give it to these analysts and they can stick it out everywhere. But I think all these different places and sites which will pop up which will look totally different — I think it will be a lot more activity this time then before. I wanted to get it (GTX stock) up to 5 and not sell much, and then sell ya know the 5 million or whatever is left...

HAGEN: Ya, that makes sense.

CW: It's (GTX stock) at $1.30 right now. I want to bring it up like 30 or 40 cents a day, and then turn a couple of things on and bam within a couple of days we could sell 500,000 or 600,000 a day for ten days, and then we're done.

b. CW advised your Affiant that, in this conversation, he is reminding HAGEN that the regulators will shut down the trading of GTX shares if CW's promotional activities result in the price of the stock rising too quickly. CW is informing HAGEN that they need at least a million shares of GTX available so that they can create an orderly rise in the stock price, which will avoid attracting attention from the regulators, and will in turn allow the group to sell of all of their shares.

c. CW advised your Affiant that, in this conversation, he also refers to the fact that none of the GTX promotional activities will be able to be tied to HAGEN, Brecher or CW, nor will the promotional material include the fact that the individuals sponsoring the promotional activity hold large shares of GTX stock. CW advised that HAGEN was aware that this was the same manner in which the promotional activities were carried out prior to CW cooperating with the government.

d. CW advised your Affiant that, in this conversation, he reminds HAGEN that in previous promotional activities any time the promotional web sites drew any attention from the regulators, Brecher would ask the GTX company attorney, "Ed", to send out a cease and desist letter to the web site. The letter from Ed would inform the web site that GTX was requesting that the information pertaining to the company be taken down. CW advised that the group's intention in doing this was to make it appear that GTX, HAGEN and Brecher were not tied to the websites in any way.

e. CW advised your Affiant that, in this conversation, he is informing HAGEN that he will soon be turning on web sites which would promote the GTX stock. CW informs HAGEN that as soon as the GTX stock price rises to around $5 a share, the group will dump the remainder of their shares on the market at a rate of approximately 500,000 or 600,000 shares a day.

## SUMMARY OF PROBABLE CAUSE FOR AN ARREST WARRANT

70. Based upon the above facts, your Affiant believes probable cause exists that DAVID ALLEN HAGEN, committed offenses associated with:

   a. **15 U.S.C. § 78j(b). Manipulative and deceptive devices**

   It shall be unlawful for any person, directly or indirectly, . . .
   (b) To use or employ, in connection with the purchase or sale of any security registered on a national securities. . . exchange or any security not so registered, . . . any manipulative or deceptive device or . . . contrivance in contravention of such rules and regulations as the [U.S. Securities and Exchange] Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

   b. **17 C.F.R. 240.10b-5. Employment of manipulative and deceptive devices**

   It shall be unlawful for any person, directly or indirectly. . .
   (a) To employ any device, scheme, or artifice to defraud,

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
(c) To engage in any act, practice, or course of business which operates or would operate. . . as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

c. **15 U.S.C. § 78ff(a). Willful violations; false and misleading statements**
   Any person who willfully violates any provision of this chapter (other than section 78dd-1 of this title), or any rule or regulation thereunder the violation of which is made unlawful or the observance of which is required under the terms of this chapter,....shall upon conviction be fined not more than $5,000,000, or imprisoned not more than 20 years, or both...

d. **18 U.S.C. § 1341. Frauds and swindles**

   Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, presentations, or promises. . . for the purpose of executing such scheme or artifice or attempting so to do, places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service, or deposits or causes to be deposited any matter or thing whatever to be sent or delivered by any private or commercial interstate carrier, or takes or receives there from any such matter or thing. . . shall be fined under this title or imprisoned not more than twenty years, or both.

e. **18 U.S.C § 1343. Fraud by wire**

   Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, shall be fined under this title or imprisoned not more than 20 years, or both.

f. **18 U.S.C. § 1956(a)(2). Laundering of monetary instruments**

   Whoever transports, transmits or transfers. . . funds from a place in the United States to or through a place outside the United States or to a place in the United States from or through a place outside the United States (A) with the intent to promote the carrying on of specified unlawful activity;

or, (B) knowing that the. . . funds involved in the transportation, transmission or transfer represents the proceeds of some form of unlawful activity and knowing that such transportation, transmission or transfer is designed in whole or in part to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity, . . . shall be sentenced to a fine. . . or imprisonment not more than twenty years, or both.

g. **18. U.S.C. § 1956(h)**

Any person who conspires to commit any offense defined in this section or section 1957 shall be subject to the same penalties as those prescribed for the offense the commission of which was the object of the conspiracy.

h. **18 U.S.C. § 1957(a)**

Whoever...knowingly engages or attempts to engage in a monetary transaction in criminally derived property of a value greater than $10,000 and is derived from specified unlawful activity, shall be punished as provided in subsection (b).

i. **18 U.S.C. § 371.**

"If two or more persons conspire either to commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner or for any purpose, an done or more of such persons do any act to effect the object of the conspiracy, each shall be fined under this title or imprisoned not more than five years, or both…"

j. **18 U.S.C. §1349**

"Any person who attempts or conspires to commit any offense under this chapter shall be subject to the same penalties as those prescribed for the offense, the commission of which was the object of the attempt or conspiracy"

Douglas P. Curran

Special Agent, FBI


Sworn to and subscribed before me this 29th day of January, 2007


United States Magistrate Judge
David Keesler

Western District of North Carolina

# Attachment A

Oct. 26, 2005

FAX to: 910 673-1630 ✓

FAX to: 703-724-7585 ✓

FAX to: 239-596 5288

VALCIEN S.A.

Private Agreement between ~~BLACK KING~~ MARK Brecher (agent,

Laureate's WAY INC ), WALCOTT Indies LTD , in
DAVE Hagen (Agent) Sam currier, agent

reference to the shares and funds owed

by the nine companies listed: ① VALCIEN SA ,

② Laureate's way INC ③ WALCOTT INdies LTD. ,

④ Toussaint LIBERTE SA. ⑤ Toubetskoy + Co. LTD. ,

COMET INvestments INTernational , Herrington

Trading INC. , TRADEsure.net INC ,
LTD
~~Carib~~ Caribenertech Enterprises ~~INC~~ , for a

term of 60 days from signing of this

agreement.

The five trading companies (#1-5)

will trade stock and receive funds from

Montague Securities, as called upon by

trading accounts volume per day. Montague

will distribute funds into the five

accounts as shown: Phase I and

have daily reports on trade and funds

available to said parties.

Name    Share List    % of # #

① VALCIEN    MB    2,666,666 shares    22.4 %

② Laureate's Way    DM    2,666,666    22.4 %

③ Walcott    SC    2,666,666    22.4 %

④ Toussaint    MB INV.    600,000    5.0 %

⑤ Toubetskoy    SC INV. + MKT.    3,300    (2m MKT   1.3 INV.)   27.

SF 30 days    Phase I    10,899,998    TOTAL

Funds will be dispersed into each of the accounts as percentage above on a daily basis and a report given to each of the parties (3) and instructions will be given to Montague from each party as to where funds are to be sent. Accounts 4 + 5 will be sent out as directed by letter from the three parties, as to where shareholders choose, with addresses and accounts.

A separate fund will be set up in Comet Investments for $2 million dollars for private placement in ETR GLOBAL. Each of the 3 parties will fund $666,666.°°, of which they received 666,666 shares as seen in share list PTAC phase I, and shown in private option placement doc. dated May 30, 2005, by Montague Securities. This sum will be minus any funds fronted to company before p.p. is completed.

# Phase II

2nd
30 days                          Shares                    %#

#1  _____    1,000,000            22%

#2  _____    1000,000             22%

#3  _____    1,000,000            22%

#4  _____    390,000              8.6

#5  _____    1,110,000            24.7%

TOTAL  4,500,000

The four trading accounts will transfer
shares as needed to the five trading accounts.
until they are empty of shares; and returned
to owners.

The first funds into the Montague will
be sent to BTX Global Corp for weekly bills
up to $75.00 per week for 1st two weeks
of trading, if needed.

The group agrees that after phase I and phase II are complete, on or before Dec. 25th, 2005, (60 days) a new agreement may be made to continue agreement with said parties and existing companies. If not continued, the three parties will sign off on acts. and end this agreement and terms.

Agreement signed this 26th day of Oct., 2005

VALCIEN SA _____

Laureate's Way INC _____

WALCOTT Indies LTD _____

_____ us agent for _____ TYPE name

_____ us agent for _____

_____ us agent for _____

11- 8-05; 2:9:PM;MONTAXU SECUSITIES

10/31/05

*Signature Sheet*

BOB EVANS — Trader for fine ads.

(agent) — Lyle Andrews — signature for — Walcott Indies LT.
                                        — Toubetskoy + Co. LT.

(agent) Mark Snecha — signature for VALCIEN S.A.
   (agent) Al (Gy) — signature for Laurentes Way Inc

(agent) Mark Snecha — signatures for TOUSSAINT Liberte S

(agent) Al (Gy)

242-356-6144

Oct. 29. 2005

Montague Securities
% owen Bethel
cc: Edison Sumner
Nassau, Bahamas

Mr. Bethel,

Please wire funds received by
Montague FOR ~~~~~ Valcien SA, on a daily basis, with
an accounting done daily and a weekly total, to

ABA #
BANK NAME                    swift code
Bank address
Further Act: name
Act. number

Please fax nightly daily total and every Friday pm
weekly total to 239-596-5288.   Thank you
                                 Valcien SA
                                 Matt Suber (agent for,

703- 724 - 7585

(Mont)                                    Phase I

| M INV | M | D | J | JINV | JMKT |
|-------|---|---|---|------|------|
| 500 | 2.666666 | 2.666,666 | 2.666,666 | 1.3 | 2 m |

TOTAL  11, 800, 000                    JG 5.966,66
              -2
        9,800, 000 (group)        $2 in company
                                          -2 m soll for co.

WK 1     2,950,000        DAILY
WK 2     2,950,000        590,000 × 2 = 1,180,000 vol.      50%
WK 3     2,950,000                 × 3 = 1,770,000 vol     33%
WK 4     2,950,000        × (2.5) Avg. 1,458,000 40%   ok

30 day trading
   20 days ——— $4-8 range

_____

(mont)                                    Phase II

| MSINV | M | D | J | JINV | JMKT |
|-------|---|---|---|------|------|
| 390 | 1 m | 1 m | 1 m | 110 | 1 m |

TOTAL  4,500, 000                    JG 2.110,000

WK  1     1,125,000        225,000 per day     25%
WK  2     1,125,000        volume 1-1.2 m
WK  3     1,125,000
WK  4     1,125,000
                                                higher price
30 days program                            2 days
20 days trading price $8-12               & higher

Feb. 9, 2006

Laureate's Way
Nassau, Bahamas

Montague Securities
Edison Sumner
Nassau, Bahamas

Edison,
    Please journal $12,000.⁰⁰ us
to Lynska LTD from Laureate's Way
for the four accounts, $2500 each and
filing, reg. office fees.

                        Thank you,

Please sign and fax to 242 356 6144.

# Attachment B

» FEATURED STOCK    » COMPANY OVERVIEW    » RECOMMENDED BROKERS

Amazing Penny Stocks is dedicated to providing expert investment advice for a variety of stocks including investing in p
This Month's Featured Stock: **GTX Global Corporation (GTXC)**

"Buy GTXC Today!"
**"643% Return Potential in Months!"**
Turn a **$ 10,000 investment into over $ 60,000!**

"Next Industry Leader in Explosive VoIP/Video Conferenc
**Immediate Buy Recommendation - 1 to 3 Month T**

### GTXC Poised to Emerge Ahead of $2.6 billion competitor, Skype Networks

GTX Global Corporation (**GTXC**) is an established leader in direct response marketing with average annual sales over $12 million derived primarily from sales of residential satellite television services. **GTXC** is utilizing these marketing capabilities to launch a proprietary, patented videoconferencing software technology that allows people across the globe to talk face-to-face with individual users or groups of users via a broadband Internet connection for a fraction of the cost of traditional telephone or VoIP services.

**GTXC** is poised to be a leader in this $20 Billion per year VoIP & Video Conferencing industry!



**GTX**GLOB
connecting without limit:

Symbol: **GTXC**
Recent Stock Price: **$6.00**
1-3 Month Target: **$26.00**
9-12 Month Target: **$45.00**
Immediate Buy Recommendation

## GTXC Key Points:

GTX Global Corp (**GTXC**) is a cash flow positive company with projected earnings growth of over 250% per year
3 years.

Financially stable company with strong balance sheet.

Multiple advantages and features over competitors such as Skype™ and WebEx™.

GTXC holds numerous patents on all of its proprietary technologies.

Patented technology uses less bandwidth while achieving better quality voice and video than competitors (whic
dependent on expensive hardware).

Explosive sales and earnings growth. By the end of 2007 sales are expected to hit nearly $360 Million with earnir
Million!

Nearest competitor "Skype™ Networks" was recently purchased by eBay for $2.6 Billion, though Skype utilizes in
technology and has yet to show a profit! Skype projects their own revenue for 2005 at $60 million. In contrast, C
has already posted a profit and is projecting higher sales in future years than this competitor.

## Revenue Projections:

|         | Sales        | Net Income   | Earnings Per Share |
|---------|--------------|--------------|--------------------|
| 2005(e) | $15,300,000  | $3,125,000   | $0.10              |

Case 3:07-mi-00015-DCK   Document 3   Filed 01/29/07   Page 35 of 54

| 2006(e) | $67,355,000  | $12,420,000  | $0.41 |
| 2007(e) | $357,132,000 | $64,770,000  | $2.16 |
| 2008(e) | $717,231,000 | $150,695,000 | $5.02 |

## Recommendation to Investors: Buy GTXC Today!

For investors seeking a significant short term profit on a modest investment, we recommend purchasing $3,000-$10,0(
**GTXC** stock which would result in up to 1400 shares. At the short term target price of $26 per share you could turn a
investment into an astounding *$36,400* in just a few short months!

At the 9-12 month projection, that same $10,000 investment would be worth up to $63,000!

For more aggressive investors, a $20,000 - $25,000 investment would buy up to 3500 shares. At the short term target
$26/share your total return would be *$91,000 in one to three months!* More than triple your initial investment!

Nine to twelve months from now, that same investment is projected to climb to over *$157,000!*

## Stock Valuation Methods:

We have derived the valuation of **GTXC** stock using 2 highly recognized methods:

1. PEG: Price/Earnings Growth ratio
2. Market Price/Earnings Valuation (the average P/E for the Video Conferencing/VOIP industry is 65)

GTX Global Corp (**GTXC**) earnings are expected to grow at a rate of over 250% per year for the next 3 years. Applyin;
results in a PEG of .26 - A PEG under 1.5 is deemed by most analysts to be outstanding because the lower the PEG the
undervalued a particular security is and the more opportunity for a substantial return. This analysis translates into a !
target price of $45/share (65 x $0.70 earnings per share)

To derive short term target price we apply the industry average P/E of 65 to estimated earnings per share of $0.70 wl
short term target price of $26/share.

## Current Market:

The current annual VOIP market is expected to reach $16 Billion by the end of this year, with continued rapid growth
per year. Market size for Video Conferencing & Video over IP is expected to reach $4 Billion by the end of December,
rapid growth at a rate of over 50% per year. GTX Global Corp (**GTXC**) is poised to be the industry leader in these rap
markets. There are currently 200 million internet broadband users worldwide seeking a way to communicate cost effe
**GTXC** provides an ideal solution for this immense user base. A key driver of Video communications products is the ra
of broadband access. GTX Global serves a global marketplace that is expected to explode.

There are over 40 Million offices in the US alone that stand to benefit in the very near future from Video over IP tech
provided by GTX Global. Included are Fortune1000 companies, governments, large companies, medium-sized compani
SOHO customers. Particularly beneficial for multi-national enterprises, multi-unit operations, and businesses serving t

A recent Pricewaterhouse Coopers report describes a multibillion-dollar ecosystem emerging for multimedia communi
asserts that the "killer application" for Broadband Internet access between now and 2006 will be the addition of vide
conferencing and messaging.

Enormous next generation profits are expected due to future advancements by cellular phone providers who offer vid
through 3G networks currently being deployed. Quality of picture, small screen size, cost of phones and an anticipate

file://D:\www.amaz.
Case 3:07-mj-00015-DCK   Document 3   Filed 01/29/07   Page 36 of 54
amazingpennystocks.com\index_1.html   12/18/2006

of cellular service all work in favor of GTX Global. The convergence of cell phone, computer, PDA, broadband WiMax, handset platforms means that future generations of mobile devices will likely provide mobility for GTX Communicator cost than 3G video service.

## Summary of Technology:

GTX Global has developed the first viable alternative to the H.323 protocol, providing the means for secure and relial and Multicast streaming over the standard Internet. Known as MUST (Managed Universal Services Transport), this all-s based technology is infinitely scalable because it does not require switching and routing servers and other traditional hardware. This technology allows GTX Global to offer VoIP, Video Multi-conferencing and Collaboration, eLearning, Vi Multicasting, Live TV, and Video Streaming.

GTX Global is all software, requires minimal servers to simply provide call routing functions. Most notably, GTX Globa developed the first means to broadcast over the Internet. Traditionally, all streaming over the Internet is Unicast: to million viewers requires a million streams of identical data and tons of bandwidth. GTX Global's broadcast technology one stream of data to reach those same million viewers using only a tiny fraction of the bandwidth!



Practical applications include:

Keeping in touch with friends and family anywhere in the world, Military, Other Government, Satellite Offices, Banking, Remote Learning/Education, Remote Training, Online Gaming/Poker, Online Dating/Match-Making

## Competitive Advantages:

- Mass multi-party video communications of unprecedented quality in a 100% software solution that works over Internet infrastructure. GTX Global's investment efficiency allows us to offer service at prices that network-ce providers cannot achieve. Both Skype™ and WebEx™ require thousands of servers to support their subscribers.
- Utilizing peer-to-peer (P2P) infrastructure enables callers to contact one-another directly via the Internet with video signal going through GTX Global's servers. This architecture means we bear NO BANDWIDTH COST for tra two-way live video and cost to carry multi-party video is far lower than competitors.
- Better frame rates (smoother motion) at higher resolution (sharper picture) with crystal clear sound in about c the bandwidth of competing products.
- Automatically negotiates firewalls. Competing products are unable to traverse firewalls without network admi opening ports for their signal to enter.
- Security: Utilizing 256 bit AES encryption with 2048 bit keys. Twice the level used by most banks for financial

# GTXC: IMMEDIATE BUY RECOMMENDATION!

Featured Stock » Company Overview » Recommended Brokers »

© 2005 AmazingPennyStocks - All Rights Reserved | Disclaimer

Case 3:07-mi-00015-DCK   Document 3   Filed 01/29/07   Page 38 of 54

» FEATURED STOCK    » COMPANY OVERVIEW    » RECOMMENDED BROKERS

# Disclaimer

**SAFE HARBOR FOR FORWARD-LOOKING STATEMENTS:**

Except for historical information contained herein, the statements on this website and newsletter are forward-looking statements that are made
safe harbor provisions of the Private Securities Reform Act of 1995. Forward-looking statements involve known and unknown risks and uncertaint
cause a company's actual results in the future periods to differ materially from forecasted results. These risks and uncertainties include, among
product price volatility, product demand, market competition and risk inherent in the companies operations. You can identify these statements
they do not relate strictly to historical or current facts. They use words such as ``anticipate,'' ``estimate,'' ``expect,'' ``project,'' ``intend,'' ``
``believe,'' "hear", "guess", and other words and terms of similar meaning in connection with any discussion of future operating or financial perfo

The information contained within this Web Site is not a solicitation to buy, sell or hold any securities mentioned. The information should not be
basis for making any investment decision. Readers are urged to make a complete review of the companies mentioned. Our stock picks are the op
editors and owners of this site. We are not licensed stock brokers or financial advisors.

Opinions expressed regarding individual stocks are based on what we believe to be reliable sources. This information is in no way a solicitation o
recommendation to purchase that stock. AmazingPennyStocks.com Ltd. was paid seventy five thousand dollars by a third party, Millenia Securitie
to cover costs of producing and decimating this report. We do not guarantee your individual results.

The information contained on this web site is based purely upon the opinions and research of AmazingPennyStocks.com. The opinions and analys
herein are based on sources believed to be reliable and written in good faith, but no representation or warranty expressed or implied is made as
accuracy, completeness or correctness.

Readers are urged to consult with their own independent financial advisors with respect to any investment. All information contained in any of o
any of our suggestions should be independently verified with the companies mentioned.

<u>Featured Stock</u> » <u>Company Overview</u> » <u>Recommended Brokers</u> »

©2006 All Rights Reserved | <u>Disclaimer</u>

» FEATURED STOCK    » COMPANY OVERVIEW    » RECOMMENDED BROKERS

## Disclaimer

**SAFE HARBOR FOR FORWARD-LOOKING STATEMENTS:**

Except for historical information contained herein, the statements on this website and newsletter are forward-looking statements that are made safe harbor provisions of the Private Securities Reform Act of 1995. Forward-looking statements involve known and unknown risks and uncertaint cause a company's actual results in the future periods to differ materially from forecasted results. These risks and uncertainties include, among product price volatility, product demand, market competition and risk inherent in the companies operations. You can identify these statements they do not relate strictly to historical or current facts. They use words such as ``anticipate,'' ``estimate,'' ``expect,'' ``project,'' ``intend,'' `` ``believe,'' "hear", "guess", and other words and terms of similar meaning in connection with any discussion of future operating or financial perfc

The information contained within this Web Site is not a solicitation to buy, sell or hold any securities mentioned. The information should not be basis for making any investment decision. Readers are urged to make a complete review of the companies mentioned. Our stock picks are the op editors and owners of this site. We are not licensed stock brokers or financial advisors.

Opinions expressed regarding individual stocks are based on what we believe to be reliable sources. This information is in no way a solicitation o recommendation to purchase that stock. InsidePennyStocks.com Ltd. was paid seventy five thousand dollars by a third party, Millenia Securities . cover costs of producing and decimating this report. We do not guarantee your individual results.

The information contained on this web site is based purely upon the opinions and research of InsidePennyStocks.com. The opinions and analyses are based on sources believed to be reliable and written in good faith, but no representation or warranty expressed or implied is made as to the completeness or correctness.

Readers are urged to consult with their own independent financial advisors with respect to any investment. All information contained in any of o any of our suggestions should be independently verified with the companies mentioned.

Featured Stock » Company Overview » Recommended Brokers »

© 2005 InsidePennyStocks - All Rights Reserved | Disclaimer

» FEATURED STOCK » COMPANY OVERVIEW » RECOMMENDED BROKERS

## Disclaimer

SAFE HARBOR FOR FORWARD-LOOKING STATEMENTS:

Except for historical information contained herein, the statements on this website and newsletter are forward-looking statements that are made safe harbor provisions of the Private Securities Reform Act of 1995. Forward-looking statements involve known and unknown risks and uncertaint cause a company's actual results in the future periods to differ materially from forecasted results. These risks and uncertainties include, among product price volatility, product demand, market competition and risk inherent in the companies operations. You can identify these statements they do not relate strictly to historical or current facts. They use words such as ``anticipate,'' ``estimate,'' ``expect,'' ``project,'' ``intend,'' ``p ``believe,'' ``hear'', ``guess'', and other words and terms of similar meaning in connection with any discussion of future operating or financial perfo

The information contained within this Web Site is not a solicitation to buy, sell or hold any securities mentioned. The information should not be basis for making any investment decision. Readers are urged to make a complete review of the companies mentioned. Our stock picks are the op editors and owners of this site. We are not licensed stock brokers or financial advisors.

Opinions expressed regarding individual stocks are based on what we believe to be reliable sources. This information is in no way a solicitation o recommendation to purchase that stock. AmazingPennyStocks.com Ltd. was paid seventy five thousand dollars by a third party, Millenia Securitie to cover costs of producing and decimating this report. We do not guarantee your individual results.

The information contained on this web site is based purely upon the opinions and research of AmazingPennyStocks.com. The opinions and analys herein are based on sources believed to be reliable and written in good faith, but no representation or warranty expressed or implied is made as accuracy, completeness or correctness.

Readers are urged to consult with their own independent financial advisors with respect to any investment. All information contained in any of o any of our suggestions should be independently verified with the companies mentioned.

Featured Stock » Company Overview » Recommended Brokers »

© 2005 AmazingPennyStocks - All Rights Reserved | Disclaimer

# Attachment C



**ENTER A SYMBOL**
VSTC
News  **GO**

**Symbol Lookup**



**for stocks above $1**

QUOTE | NEWS | CHARTS | COMPANY INFO | FINANCIAL REPORTS | SEC FILINGS | TRA

Home >>   Quotes & News >>   News >>   VSTC

---

**VSTC -- Vision Technology Corp.**
Com ($0.001)

**GTX GLOBAL ANNOUNCES MERGER WITH YADIO**

Media Contact:
Jennifer Howard
(800) 995-GTXC
press@gtxglobal.net

**SPONSORED LINKS**

**Trade Currency with INC. 500 Industry Leader: CMS**
CMS Forex offers 24/hr commission-free online currency trading, 400:1 leve...

**Free Stock Trades**
Trade stocks for free on Zecco.com The Only Free Trading Community

**Free Traders Resource CD**
The CME E-mini Traders Resource CD from Man Financial. Yours Free, Get One...

**Trade the US Dollar**
24 hour FOREX trading - Mini Accounts from $250 - Free Practice Account.

**Free Practice Account**
Start Trading Online Today With A Free $50,000 Practice Account!

**Buy a link Now**

**GTX GLOBAL ANNOUNCES MERGER WITH YADIO**

Las Vegas, NV -- Dec. 20, 2005 - GTX Global Corporation (GTXC), a leading provider of innova that enable profitable IP communications and Yadio Inc., a leading entertainment and commun announced that that GTX Global and Yadio have entered an agreement, dated as of December will merge with GTX Global Corporation. Under this merger, GTX Global will assume the Yadio corporate name change to Yadio Inc. The management of Yadio will select a new Board of Dire assume autonomous control of the public company.
"GTX Global's merger with Yadio is a continuation of our business strategy to build a diversifie deeper, more valuable solutions for our consumers and business partners," said Curtis Garth, "We believe that this acquisition is good news for our shareholders, customers, employees, an Garth. "By combining the strengths of both GTX Global and Yadio, we believe we will be able t Internet television, streaming, and video conferencing and collaboration services to consumers world."
GTX Global is merging with Yadio for $64,300,000 in cash and stock.

**About GTX Global**
GTX Global partners with providers and integrators of IP communications services and equipm multimedia solutions that retain customers and create new revenue opportunities. GTX Global' resolved existing bandwidth, connectivity, and security issues businesses face when attemptin over IP by efficiently minimizing bandwidth requirements and intelligently controlling packet lo IP (VoIP) providers, video/web conferencing companies, or voice/video/data over IP platforms multimedia capabilities without additional hardware or an expensive Quality of Service (QoS) I developed the industry's first solution to support delivery of high-quality multimedia with QoS- over standard broadband lines. GTX Global's business lines including: VizTV(TM), Television ov delivering stunning television quality over existing broadband infrastructure; VizCom(TM), Ente videoconferencing, collaboration and productivity tools to drive greater performance from disp supporting large-scale video meetings with full access control, advance presentation capabiliti serving users with a need to reach vast numbers of participants; VizLearn(TM), distance learni expand the classroom for creation and diffusion of knowledge (education, corporate training, c VizTalk(TM), consumer videocalling over personal computers in unsurpassed quality. For more www.gtxglobal.net and www.vizco.com.

**About Yadio**
Yadio provides our member and subscribers with an entertainment and communications platfo TV, radio, video and audio. Yadio simplifies awareness and selection of programming in the ex The Yadio player provides great programming with online TV, radio, Podcasts, games, commu subscriber to personalize their online newspaper. The Yadio community is the Media Guide of t

Case 3:07-mj-00015-DCK   Document 3   Filed 01/29/07   Page 43 of 54



make pinksheets.com
your homepage

on a life of its own through the Yadio community where people meet, share interests, talk, net
are the core of what people share in the Yadio Community. Our users identify with media and
the site exposing constantly shifting trends. Here, people discuss media using Yadio as a socia
and dislikes. Yadio licenses its technology providing companies a direct connection to their cus
Corporations, for the first time, have an entertainment premium, which builds brand awarenes
maintains an ongoing communication link between buyer and seller. Please visit www.yadio.co

This press release includes "safe harbor" language pursuant to the Private Securities Litigation
amended, indicating that certain statements about the Company's business contained in the pi
looking" rather than "historic." The press releases contain forward-looking statements that inv
concerning GTX Global's expected financial performance (as described without limitation in quo
the press release), as well as GTX Global's strategic and operational plans. Actual results may
results predicted and reported results should not be considered as an indication of future perfo

# # #

The above news release has been provided by the above company via Pink Sheets News Servi
not Pink Sheets are solely responsible for the accuracy of the such news releases. Please read
Warning.

**Search for Dun & Bradstreet reports on this company.**

**$7 online trades for stocks above $1; $7
+ ½% principal for stocks below $1.**



SPONSORED LINKS

**Free Traders Resource CD**
The CME E-mini Traders Resource CD from Man Financial. Yours Free, Get One Today!

**Trade the US Dollar**
24 hour FOREX trading - Mini Accounts from $250 - Free Practice Account.

**Online Currency Trading -Free Demo Account**
Trade 24 hours a day - Free Award-winning Software. Open an account and begin currency trading!

**Free Practice Account**
Start Trading Online Today With A Free $50,000 Practice Account!

**Reuters Custom Stock Screener**
Free trial to Reuters PowerScreener 3.0 - the most powerful stock screener for individual investors.

All information contained herein is provided "as is." Pink Sheets LLC makes no represent
expressed or implied, as to the accuracy, timeliness, or completeness of the information
Pink Sheets LLC, nor its directors, officers, employees, or third party data suppliers, shal
or liability to verify the information and/or its source or for the use, misuse, or inability t
provided. None of the foregoing parties shall be liable to any third-party claims or losses
Accordingly, investors should not use this information as the basis for making an investr
Risk Warning and Terms of Service for more information.

Risk Warning  |  Contact Regulators

Home | About Us | Contact Us | FAQ | Glossary
Quotes & News | Market Activity| Company Search | OTC Guide | Products

© Copyright 2004, Pink Sheets LLC. All Rights Reserved.
Please read our Terms of Service, Linking & Framing Terms, Trademarks, and Pr

Comments or Suggestions?

# Attachment D

## AGREEMENT OF MERGER

This Agreement of Merger (this **"Agreement"**) dated as of December 16, 2005, is by and between GTX Global Corporation (**"GTX"**), a Nevada corporation, Hagen Family Partners, Ltd.(**"HPF"**), a Colorado limited partnership, Comet Investment International (**"Comet"**), a _____ corporation and Yadio, Inc. (**"Yadio"**), a Florida corporation. Capitalized terms not otherwise defined herein shall have the meanings ascribed to such terms in paragraph 54 of this Agreement.

WHEREAS, Yadio is interested in selling and transferring to GTX, and GTX is interested in buying Yadio stock for cash, GTX stock, the assumption of Yadio debts, and

WHEREAS, Yadio is in the business of providing its members and subscribers with an entertainment and communications platform in the distribution of online TV, radio, video and audio (**"Yadio Business"**); and

WHEREAS, GTX is in the business of and has created a line of valuable video conferencing and video transport related technologies for the Internet and artificial intelligence applications (**"GTX Business"**) which are intellectual property belonging to GTX (**"Intellectual Property"**) and to which GTX holds or owns patent rights as more fully set forth herein; and

WHEREAS, the parties hereto, in facilitating the sale of the Yadio Business, are interested in effecting the Merger (as defined below) of Yadio into GTX in accordance with the provisions of this Agreement; and

WHEREAS, HFP is a substantial stockholder of GTX and is desirous of GTX acquiring the valuable technology, assets, personnel and goodwill of Yadio; and

WHEREAS, Comet is a stockholder of GTX and is desirous of GTX acquiring the valuable technology, assets, personnel and goodwill of Yadio, and is willing to provide security for the indemnification obligations hereunder.

NOW, THEREFORE, in consideration of the foregoing promises and the representations, warranties, covenants and agreements herein contained, and intending to be legally bound hereby, Yadio, HFP, Comet and GTX hereby agree as follows:

### THE MERGER

1.     <u>The Merger.</u>  At the Effective Time (as defined below) and upon the terms and subject to the conditions of this Agreement and the applicable provisions of the Nevada Corporations Code (**"Nevada Law"**), Yadio shall be merged with and into GTX with GTX as the surviving corporation (the **"Merger"**). Yadio and GTX hereby represent and warrant to the other that the

Case 3:07-mj-00015-DCK   Document 3   Filed 01/29/07   Page 47 of 54    011978

Yadio shall be responsible for all such taxes imposed on the Yadio Business prior to the Closing.

    56.    <u>Counterparts.</u>

This Agreement may be executed in one or more counterparts, each of which shall be deemed to be an original but all of which shall constitute one and the same agreement.

IN WITNESS WHEREOF, each of the parties has caused this Agreement to be duly executed on its behalf as of the day and year first above written.

YADIO, INC.                    GTX GLOBAL CORPORATION

By:_____    By:_____
       Trenton Martin - CEO             Curtis Garth - CEO

COMET INVESTMENT INTERNATIONAL    By:_____
                                     Keri Keenan - Vice President

By:_____    By:_____
      It's _____           Mark Brecher - Secretary

HAGAN FAMILY PARTNERS, LTD.

By:_____
      It's_____

Case 3:07-mj-00015-DCK   Document 3   Filed 01/29/07   Page 48 of 54

012014

To the extent that any franchise, sales, use, personal property, excise, value added or other such taxes, except taxes based on income, are imposed in the United States as a result of the Closing of the Merger or in relation to the Yadio Business thereafter, such taxes shall be paid by GTX. Yadio shall be responsible for all such taxes imposed on the Yadio Business prior to the Closing.

56.  Counterparts.

This Agreement may be executed in one or more counterparts, each of which shall be deemed to be an original but all of which shall constitute one and the same agreement.

IN WITNESS WHEREOF, each of the parties has caused this Agreement to be duly executed on its behalf as of the day and year first above written.

YADIO, INC.                               GTX GLOBAL CORPORATION

By:_____               By:_____
    Trenton Martin - CEO                      Curtis Garth - CEO

COMET INVESTMENT INTERNATIONAL            By:_____
                                              Mark Brecher - Secretary

By:_____
    It's _____

HAGEN FAMILY PARTNERS, LTD.

By:_____
    It's General Partner

FOIA Confidential Treatment Requested
on behalf of GTX Global Corporation
by Akin Gump Strauss Hauer & Feld LLP,
580 California Street, Suite 1500, San Francisco,
CA 94104, (415) 765-9500

GTX00017

**Edward Ovsenik**

| | |
|---|---|
| **From:** | Shelly Lustig [shelly@yadio.com] |
| **Sent:** | Wednesday, January 18, 2006 1:28 PM |
| **To:** | David Hagen; Edward Ovsenik; Mark Brecher |
| **Cc:** | Trent Martin |

**Subject:** GTX / Yadio Merger

Gentlemen:

Attached is a final draft of the GTX / Yadio Agreement of Merger (rev 1-18-06). Please review this document with your legal counsel and have it signed on page 37 by GTX, HFP and Comet and initialed on each page (including schedules and exhibits) by all signatories.

Please complete Schedules 12, 18 D (1), 18 D (4), 18 D (6), 18 D (7), 18 E (1) and 19 L (1) and attach all required exhibits.

Please then deliver 5 executed originals to Trent Martin for execution by Yadio.

Mark, if you would like this series of documents sent directly to your attorney, please furnish me with his email address.

Please call me with any questions.


Sheldon M. Lustig
General Counsel
Yadio, Inc.
4800 N. Federal Highway
Boca Raton, FL 33431
847-962-1111 Voice
847-679-2005 Fax
Shelly@Yadio.com

We Make The Difference In Online Entertainment™
www.yadio.com
www.rsstoday.com

This e-mail message is intended only for use by the individual, recipient or entity to which it is addressed. This message is confidential and may contain information that is legally privileged, confidential or exempt from disclosure under applicable law. If you are not the intended recipient, you may not review, copy, or distribute this message. If you have received this communication in error, please notify us immediately by e-mail or telephone and delete the original message. Thank you

5/3/2006

009858

# Attachment E



ENTER A SYMBOL

VSTC

News

GO

Symbol Lookup

**Scottrade**

for stocks above $1

TD AMERITRADE

Home >>   Quotes & News >>   News >>   VSTC

QUOTE | NEWS | CHARTS | COMPANY INFO | FINANCIAL REPORTS | SEC FILINGS | TRA

**VSTC -- Vision Technology Corp.**
Com ($0.001)

**GTX GLOBAL CORPORATION AND YADIO INC. MERGER TERMINATED**

FOR IMMEDIATE RELEASE

Media Contact:
Jennifer Howard
(800) 995-GTXC
press@gtxglobal.net

GTX GLOBAL CORPORATION AND YADIO INC. MERGER TERMINATED

LAS VEGAS, NV, February 2, 2006: GTX Global Corporation (pink sheets: GTXC) announced to
Inc. have agreed to terminate their merger agreement under provision of the agreement. Yadi
appointed as per the agreement have resigned and the following have been appointed to the G

Curtis Garth, CEO / Director
Mark Brecher, Secretary and Treasurer / Director
Edward Ovsenik, V.P., General Counsel / Director

Company shares that have been issued under the Agreement of Merger to Yadio, its officers, d
General Counsel will be cancelled. Other shares issued pertaining to the agreement to Logistic

The companies will continue to work together to reach agreement on the future use of the GT)

The Company will continue to pursue further opportunities to enhance the company's products
or acquisitions which will further increase shareholder value.

GTX Global also announces today that the due diligence period under the licensing agreements
and EU countries and Heel Strike Corporation for Canada has been extended by mutual agreer

About GTX Global

GTX Global partners with providers and integrators of IP communications services and equipm
multimedia solutions that retain customers and create new revenue opportunities. GTX Global'
resolved existing bandwidth, connectivity, and security issues businesses face when attemptin
over IP by efficiently minimizing bandwidth requirements and intelligently controlling packet lo
IP (VoIP) providers, video/web conferencing companies, or voice/video/data over IP platforms
multimedia capabilities without additional hardware or an expensive Quality of Service (QoS) I
developed the industry's first solution to support delivery of high-quality multimedia with QoS-
over standard broadband lines. GTX Global's business lines including: VizTV(TM), Television ov
delivering stunning television quality over existing broadband infrastructure; VizCom(TM), Ent
videoconferencing, collaboration and productivity tools to drive greater performance from disp
supporting large-scale video meetings with full access control, advance presentation capabiliti
serving users with a need to reach vast numbers of participants; VizLearn(TM), distance learni
expand the classroom for creation and diffusion of knowledge (education, corporate training, c
VizTalk(TM), consumer videocalling over personal computers in unsurpassed quality. For more
http://www.gtxglobal.net/.

SPONSORED LINKS

**Buy Stocks Online for $0**
Trade stocks for free on Zecco.com The Only Free Trading Community

**Trade with FOREX.com**
Sign up for a free $50,000 practice account. Advanced trading platform wi...

**Free Practice Account**
Start Trading Online Today With A Free $50,000 Practice Account!

**Reuters Custom Stock Screener**
Free trial to Reuters PowerScreener 3.0 - the most powerful stock screener...

**Practice Forex Trading**
Start Trading With A Free $50,000 Demo Account - Play Before Pay!

**Buy a link Now**



make pinksheets.com
your homepage

This press release includes "safe harbor" language pursuant to the Private Securities Litigation
amended, indicating that certain statements about the Company's business contained in the pr
looking" rather than "historic." The press releases contain forward-looking statements that inv
concerning GTX Global's expected financial performance (as described without limitation in quo
the press release), as well as GTX Global's strategic and operational plans. Actual results may
results predicted and reported results should not be considered as an indication of future perfo

# # #

The above news release has been provided by the above company via Pink Sheets News Servi
not Pink Sheets are solely responsible for the accuracy of the such news releases. Please read
Warning.

**Search for Dun & Bradstreet reports on this company.**

**$7 online trades for stocks > $1; $7 +
½% principal for stocks < $1.**



**SPONSORED LINKS**

**Currency Trading - Zero Commissions**
Diversify your portfolio with Forex - the most liquid market in the world. CMS offers free charts, news and expert...

**Trade with FOREX.com**
Sign up for a free $50,000 practice account. Advanced trading platform with real-time quotes, charts, news, resea.

**Online Currency Trading -Free Demo Account**
Trade 24 hours a day - Free Award-winning Software. Open an account and begin currency trading!

**Start Forex Trading**
Fast Execution, Easy To Use Software - Free $50,000 Practice Account.

**Reuters Custom Stock Screener**
Free trial to Reuters PowerScreener 3.0 - the most powerful stock screener for individual investors.

All information contained herein is provided "as is." Pink Sheets LLC makes no represent
expressed or implied, as to the accuracy, timeliness, or completeness of the information
Pink Sheets LLC, nor its directors, officers, employees, or third party data suppliers, sha
or liability to verify the information and/or its source or for the use, misuse, or inability t
provided. None of the foregoing parties shall be liable to any third-party claims or losses
Accordingly, investors should not use this information as the basis for making an investr
Risk Warning and Terms of Service for more information.

Risk Warning  |  Contact Regulators

Home | About Us | Contact Us | FAQ | Glossary
Quotes & News | Market Activity| Company Search | OTC Guide | Products

© Copyright 2004, Pink Sheets LLC. All Rights Reserved.
Please read our Terms of Service, Linking & Framing Terms, Trademarks, and Pr

Comments or Suggestions?

Case 3:07-mj-00015-DGK   Document 3   Filed 01/29/07   Page 54 of 54